# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs May 3, 2011

## STATE OF TENNESSEE v. STEVEN MALONE

### Appeal from the Criminal Court for Shelby County
### No. 07-05771    Paula Skahan, Judge

---

### No. W2010-00947-CCA-R3-CD  - Filed September 7, 2011

---

A Shelby County jury convicted the Defendant, Steven Malone, of second-degree murder and aggravated assault. He was sentenced to concurrent sentences of twenty-five years for the second-degree murder and four years for the aggravated assault. On appeal, the Defendant argues that the evidence was insufficient to sustain his conviction for second-degree murder, that the State failed to establish a proper chain of custody as to certain evidence, that extraneous information improperly influenced the jury's verdict, and that cumulative error requires a reversal of his convictions. Following our review, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.

DAVID H. WELLES, SP. J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and D. KELLY THOMAS, JR., JJ., joined.

C. Anne Tipton, Memphis, Tennessee, for the appellant, Steven Malone.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; Betsy Carnesale and Jennifer Nichols, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

This case arises out of the December 20, 2006 gunshot killing of William Craig, Jr. ("Bobby Craig"). A Shelby County grand jury indicted the Defendant and Mardacy Greer[1] for first-degree premeditated murder, first-degree murder in the perpetration of a robbery, and especially aggravated robbery. On January 29, 2010, a jury convicted the Defendant of the lesser-included offenses of second-degree murder and aggravated assault, respectively. The trial court sentenced him on February 22, 2010, to concurrent sentences of twenty-five years for the second-degree murder conviction and four years for the aggravated assault conviction. The trial court subsequently merged the two convictions to avoid violating double jeopardy principles. This appeal followed.

### Factual Background

On December 19, 2006, the victim, Bobby Craig, lived with his parents and his seventeen-year old daughter, Sarah, in Erin. He had lived there for the previous three weeks after moving from Memphis. When the victim left Erin the morning of December 19, he hugged his daughter and drove his father's red Ford pick-up truck to Memphis. He told Sarah that he was going to help the police in Memphis, retrieve his gray Dodge pick-up, and bring her sisters, who lived in North Mississippi, home for Christmas. At 5:25 a.m. on December 20, the victim called Sarah; he told her that he had the key to his truck and was waiting "outside of a boy's house" for someone to come pick it up. He told her several times that he loved her and abruptly hung up saying, "Shit, I've got to go."

The previous evening, the victim had worked with Sergeant Clay Aitken of the Shelby County Sheriff's Department as a confidential informant on a burglary investigation. When Sgt. Aitken noticed that the victim was not driving his usual gray Dodge pick-up truck but rather a red Ford extended-cab pick-up truck, the victim told him that the red truck belonged to his father. The investigation ended around 9:00 p.m. on December 19 with the arrest of the burglary suspect, and the victim and Sgt. Aitken parted ways. When Sgt. Aitken checked his cell phone the next morning around 8:00, he saw several missed calls from the victim between 6:00 and 6:30 a.m. After one call, the victim left a voice mail message saying, "Call

---

[1] The trial transcript refers to the co-defendant as "Mardacio Greer"; however, the indictment lists the co-defendant as "Mardacy Greer." This Court's practice is to refer to parties as named in the indictment. Therefore, the co-defendant will be referred to as "Mardacy Greer."

me. I need your help." Sergeant Aitken tried unsuccessfully several times to contact the victim over the course of the morning.

Sergeant Aitken first met the victim in mid-2006 when he was a detective assigned to the "ALERT" squad of the Shelby County Sheriff's Department, which primarily conducted undercover investigations of property crimes. During an unrelated traffic stop of the victim, the victim told the patrol officer that he had some helpful information for law enforcement. The patrol officer recognized that the information could be used by the ALERT squad and contacted Sgt. Aitken. The victim met with Sgt. Aitken and conveyed information about a stolen vehicle. He told Sgt. Aitken that he had "personal issues with drugs" and wanted to get away from that lifestyle and redeem himself with his family. The victim subsequently worked as a confidential informant with the sheriff's department.

On the morning of December 20, Dennis Elam was driving to work. When he stopped at the intersection of Carrolton and Benjestown Roads in Shelby County around 6:00 a.m., he noticed a red Ford pick-up truck approaching from the left and heading toward the dead-end portion of Benjestown Road. The driver was a "white male[,] about forty" and the front passenger was an African-American male. He noticed a passenger in the rear seat of the extended cab but could not determine any details about his or her appearance. After Elam turned in the opposite direction, he looked in his rearview mirror and saw the red truck turn into the driveway of an abandoned house at the end of Benjestown Road.

Around 11:00 a.m. on December 20, Memphis Light, Gas, and Water foreman David Quinn was in the area of Carrolton and Benjestown Roads conducting "re-reads" on meters. He drove down the driveway of an abandoned house at the end of Benjestown Road to relieve himself. As he approached the house, he saw the body of a white male on the left side of the driveway. After confirming that the man was dead, Quinn used his walkie-talkie to call the company's dispatch about the situation. Law enforcement was then called to the scene.

Shelby County Sheriff's Department Lieutenant John Mills was called to the scene on Benjestown Road to supervise the collection of evidence. He found the victim's body about half-way down the driveway leading to an abandoned house. A black baseball cap and a pink cell phone were near the body, which was surrounded by shattered glass from a vehicle window. Lieutenant Mills collected seven shell casings near the body—four .40 caliber shells and three nine millimeter (9 mm) shells. He noticed a large area of blood on the ground next to the body and some leaves stuck to the victim's face. From this evidence, as well as the positioning of the victim's legs, Lt. Mills concluded that the victim had originally fallen face down and had been turned over before the police arrived.

Earlier that morning, Louis Patterson was in bed when he heard a noise behind his house near the boat ramp to Sky Lake, but he did not get up to investigate the noise. As he was getting dressed, he looked out the bathroom window and saw a red pick-up truck partially submerged in the lake with its rear wheels spinning. When he went outside to warm up his vehicle, he saw what he thought was an olive-colored, two-toned pick-up truck with a blue tailgate parked diagonally across the street from his house. He saw an African-American male get out of the passenger's side of the truck and walk around to the driver's side. The man then walked down the boat ramp. He went back inside to finish his preparations for work and heard more commotion outside. He went outside again, and the red truck was further submerged in the lake, but he saw no one near the truck. He then saw two men coming up the boat ramp; one appeared to be the same man he saw earlier, and the other was another African-American. He believed that they saw him because they turned their faces away from him. The two men walked past the pick-up truck parked on the street. Mr. Patterson then left for work but returned shortly thereafter because he had forgotten his lunch. The olive-colored pick-up truck was gone. He then instructed his girlfriend to call the police and report the vehicle in the lake.

Around midday on December 20, Sgt. Aitken received a call from a detective in the homicide division of the sheriff's department advising him that Bobby Craig had been "the victim of a homicide." Sergeant Aitken drove to the crime scene and identified the victim, who had been shot several times. Because of his close ties to and recent contact with the victim, Sgt. Aitken participated in the murder investigation. Along with other officers, he began looking for the victim's gray Dodge pick-up truck and the red Ford pick-up truck he had been driving the night before. The red Ford pick-up was subsequently found partially submerged in Sky Lake.

Willie Wells with Downs Wrecker Service was dispatched  shortly after noon on December 20 to pull the red Ford pick-up out of Sky Lake. Wells found the truck partially submerged with the engine still running and the transmission in drive; the rear wheels were spinning. After Wells pulled the truck out of the lake, he noticed two bricks against the gas pedal, what he thought was human flesh on the steering wheel, and a bullet casing on the floor. He also noticed a bullet hole in the left door panel and a shattered left window. At that point, he told the officers present that he could not tow the vehicle because it appeared to be a crime scene. Once the Shelby County Sheriff's Department took possession of the truck, Wells towed it to the sheriff's department crime scene investigation center.

Around 6 p.m. on December 20, Shelby County Sheriff's Lt. Philip Peterson stopped Mardacy Greer driving a gray Dodge pick-up truck. After Greer was taken into custody, the Defendant became a suspect in the victim's murder. The Defendant was eventually found later that evening hiding under a bed at his sister's apartment and was apprehended with the

use of a K-9 officer. Sergeant Chris Harris transported the Defendant to The MED for treatment of a dog bite wound sustained during his arrest. After he was treated and released, Sgt. Harris bought food for both himself and the Defendant and took him to the criminal justice center in Memphis for questioning.

Sergeant Harris advised the Defendant of his Miranda rights, and the Defendant signed a waiver of those rights. The Defendant admitted to Sgt. Harris that he "rented" the victim's Dodge truck by giving him money and crack cocaine in exchange for the use of the truck. He said that, in the early morning hours of December 20, the victim came to his house to retrieve his truck, but then said he would sell it to the Defendant for "[a] little hundred and these four rocks." The Defendant did not have any crack cocaine to sell to the victim, so they drove a red Ford pick-up truck to Mardacy Greer's house to get the crack cocaine. Greer got into the rear of the red Ford pick-up and directed the victim to drive to his "trap house" on Benjestown Road, where he stored and sold drugs.

When they arrived at the house, Greer got out of the truck and walked toward the house. The victim was impatient and thought they did not have any drugs for him. Greer then walked back to the truck, asking again what the victim wanted. At this point, the victim became suspicious that something was going on. Greer pulled out a gun and shot the victim several times. The Defendant also fired on the victim. Greer then pulled the victim out of the truck and shot him in the head because he was still moving. After Greer rolled the victim over, the Defendant retrieved the key to the Dodge pick-up from the victim's pocket. The Defendant and Greer then drove to the Defendant's house, got the Dodge pick-up, and drove both trucks to Sky Lake where Greer put bricks on the accelerator of the Ford. They then rolled the truck into the lake.

The Defendant testified at trial similarly to the statement he gave to Sgt. Harris. He testified that he sold crack cocaine to the victim several times in 2006 and that the victim "rented" his Dodge truck to him in exchange for drugs. He stated that, sometime in November 2006, the victim left the truck with him and did not return to claim it. The victim did not contact him against until December 20, when he showed up at the Defendant's house in the early morning house to retrieve his truck. The Defendant testified that he gave the truck key back to the victim but that the victim changed his mind and decided to buy more drugs. They then drove to Greer's house in the red Ford pick-up to get more drugs. Greer directed them to another location on Benjestown Road to get the drugs. The Defendant stated that he and Greer both got out of the truck at the house and that Greer walked behind the house as if he was going to get the drugs. When Greer returned, the Defendant heard the "gas growl" on the truck and the pop of gunfire. He stated that his first reaction was to reach for his gun, a Glock .40 caliber pistol, and that he fired several shots at the victim. He testified that he stopped shooting because he did not know why he was shooting in the first

place. When the shooting stopped altogether, Greer pulled the victim out of the truck, flipped him over, and told the Defendant to get the key to the Dodge out of the victim's pocket. After they got to Sky Lake, he gave some bricks to Greer, which Greer placed in the truck, and together they pushed the truck into Sky Lake.

The Defendant's girlfriend, Brittany Evans, testified that the Defendant sold crack cocaine. In late 2006, the Defendant and Greer shared possession of a gray Dodge pick-up truck that the Defendant had obtained from a "cone"—someone who trades or pawns property for drugs. She knew the "cone" was a middle-aged white man. On December 19, 2006, the Defendant came to her house and stayed until the early morning hours of December 20. Around 4:00 a.m., she called the Defendant at his mother's house. While they were talking, the Defendant said that the man who owned the truck was there and wanted more drugs for the truck. She heard the Defendant say that he did not have any drugs but that he would call Greer on a three-way call while he was still on the phone with Evans. Greer did not answer the phone. Later that afternoon, the Defendant called Evans to say that Greer had been arrested. Shortly thereafter, officers arrived at Evans' house looking for the Defendant. The Defendant called her approximately forty-five minutes later, and she kept him on the phone while officers located the Defendant at his mother's house.

Shelby County Sheriff's Sergeant Ray Sides photographed and examined both the gray Dodge and red Ford pick-up trucks after they were delivered to the crime scene investigation center. Under the armrest of the Dodge, Sgt. Sides found a Hi-Point 9 mm pistol and a Christmas card addressed to "Miss Brittany." The pistol held four live rounds in the clip, but was capable of holding eleven to twelve rounds.

In the red Ford truck, Sgt. Sides found two bullet holes in the driver's side door. The driver's side window was completely shattered. He also found five spent shells in the truck: one on the floor, one in the driver's door handle, two inside the driver's door panel, and one under the driver's seat. He found two bricks and a shoe near the accelerator and another shoe in the back seat. He noticed a large blood stain on the driver's seat and blood spatter throughout the cab, including on the center console and on the passenger's seat. He also found a piece of human tissue on the steering wheel. Behind the driver's seat, he found a bloody tie-down strap. He also located a Christmas present behind the passenger's seat addressed to "Maddy" from "Grandma and Paw Paw Craig."

After the red Ford was processed, it was returned to the victim's father, William Craig, Sr. In the process of cleaning the truck in early 2007, Mr. Craig found a shell casing in the pocket of the passenger's side door. He put the casing in a bag and delivered it to Sgt. Robert Butterick, who was the case officer on the murder investigation. On February 7, 2007, Sgt. Butterick tagged the 9 mm shell casing he had received from Mr. Craig several

weeks earlier. Sergeant Butterick submitted all of the ballistics evidence collected during the investigation, including the newly-found shell casing, to the Tennessee Bureau of Investigation ("TBI") for analysis. Sgt. Butterick also prepared gunshot residue kits taken from the Defendant, Greer, and the victim for analysis by the TBI.

TBI Special Agent Laura Hodge analyzed the gunshot residue kits collected from the Defendant, Greer, and the victim. The results of the gunshot residue analysis were positive for residue on both Greer and the victim. She explained that residue could be present on a gunshot victim because residue comes from the end of the barrel when a gun is fired, therefore exposing the victim to residue. The results from the Defendant's sample, taken sixteen hours after the incident, were inconclusive. However, due to the fragile nature of gunshot residue, she could not eliminate the possibility that the Defendant had fired, handled, or been near a gun when it was fired.

TBI Special Agent Don Carman examined the ballistics evidence submitted by Sgt. Butterick. He analyzed the 9 mm Hi-Point pistol and the 9 mm cartridges found in the gray Dodge pick-up truck; three 9 mm casings and four .40 caliber casings found at the crime scene; one 9 mm casing, two fired 9 mm bullets, two fired .40 caliber bullets, and a 9 mm bullet found in the red Ford pick-up truck; and one .40 caliber bullet found in the victim's body. Agent Carman concluded that the four 9 mm casings and the three 9 mm bullets were fired from the 9 mm Hi-Point pistol found in the Dodge pick-up truck. He also determined that the four .40 caliber casings were fired from the same weapon and that the three .40 caliber bullets bore the same rifling pattern. Agent Carman testified that the .40 caliber ammunition was consistent with having been fired from either a Glock-type or Smith and Wesson Sigma firearm.

Shelby County Assistant Medical Examiner Lisa Funte performed the autopsy of the victim. She identified nine gunshot wounds, including three that were immediately fatal. She recovered a bullet from one of the fatal wounds and testified that the victim would have died if that had been the only gunshot wound he sustained. She was able to determine that the victim was shot from a distance of two to three feet and based on the trajectory and placement of the wounds, that the wounds were consistent with someone shooting the victim from the passenger's side of a vehicle. A post-mortem toxicology report indicated the presence of cocaine metabolites in the victim's blood, indicating that he ingested cocaine within a few hours of his death.

**Analysis**

**I. Sufficiency of the Evidence for Second-Degree Murder**

The Defendant contends that the evidence was insufficient to support his conviction for second-degree murder. Specifically, he argues that he did not knowingly kill the victim because he "only fired his gun after Mr. Greer fired and when he perceived [the victim] to be attempting to pull a gun himself."

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

Second-degree murder is a knowing killing of another. Tenn. Code Ann. § 39-13-210(a)(1). A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. Tenn. Code Ann. § 39-13-302(b).

The evidence in this case, considered in the light most favorable to the State, shows that the Defendant brought a loaded .40 caliber semi-automatic handgun to a drug deal he was facilitating. When the victim got concerned about the circumstances of the deal, the Defendant and his drug selling partner, Mardacio Greer, pulled out their weapons and fired upon Bobby Craig. The Defendant admitted as much in his statement to police and at trial. The medical examiner recovered a .40 caliber bullet from the victim during the autopsy, one of three wounds that caused fatal injuries to the victim. The Defendant admitted that he owned and shot the victim with a .40 caliber Glock handgun.

The Defendant contends, however, that he acted out of fear, negating a knowing mental state. Other than this self-serving testimony, the record does not support such a conclusion. By all accounts, the victim was unarmed, and no evidence at trial established that either the victim or Greer threatened the Defendant. In fact, the Defendant specifically testified that he stopped shooting at the victim because he did not know why he was shooting at him in the first place. The determination of whether a killing is knowing or the result of adequate provocation is one for the jury. See State v. Williams, 38 S.W.2d 532, 539 (Tenn. 2001) (citing State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995)). The jury heard the evidence and rejected the Defendant's assertion that he shot the victim out of fear or shock, as was its prerogative. The evidence supports the jury's finding that the Defendant is guilty of second-degree murder beyond a reasonable doubt. This issue is without merit.

## II. Chain of Custody

The Defendant next contends that the State failed to establish an unbroken chain of custody for a shell casing found in the victim's truck by his father several weeks after the murder. He also contends that the trial court erred by allowing the victim's father to testify in violation of the sequestration rule. Following our review, we conclude that the trial court acted within its discretion by admitting this evidence.

We review challenges to the chain of custody of evidence under the abuse of discretion standard. State v. Scott, 33 S.W.3d 746, 752 (Tenn. 2000); State v. Beech, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987). Under this standard, we will not reverse unless the trial court "'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

Tennessee Rule of Evidence 901(a) provides as follows: "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." As we have previously recognized, it is

"'well-established that as a condition precedent to the introduction of tangible evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody.'" <u>Scott</u>, 33 S.W.3d at 760 (quoting <u>State v. Holbrooks</u>, 983 S.W.2d 697, 700 (Tenn. Crim. App. 1998)). This evidentiary rule is designed to insure "that there has been no tampering, loss, substitution, or mistake with respect to the evidence." <u>Id</u>. (quoting <u>State v. Braden</u>, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)).

Even though each link in the chain of custody should be sufficiently established, this rule does not require that the identity of tangible evidence be proven beyond all possibility of doubt; nor should the State be required to establish facts which exclude every possibility of tampering. <u>Scott</u>, 33 S.W.3d at 760. An item is not necessarily precluded from admission as evidence if the State fails to call all of the witnesses who handled the item. <u>See</u> <u>State v. Johnson</u>, 673 S.W.2d 877, 881 (Tenn. Crim. App. 1984). Accordingly, when the facts and circumstances that surround tangible evidence reasonably establish the identity and integrity of the evidence, the trial court should admit the item into evidence. On the other hand, if the State fails to offer sufficient proof of the chain of custody, the "evidence should not be admitted . . . unless both identity and integrity can be demonstrated by other appropriate means." <u>Scott</u>, 33 S.W.3d at 760 (quoting Neil P. Cohen et. al., Tennessee Law of Evidence § 901.12 (3d ed. 1995)).

Here, Sgt. Butterick testified that he received a 9 mm shell casing from the victim's father, William Craig, Sr. He tagged the shell casing into evidence on February 7, 2007. The Defendant objected on hearsay grounds when the State asked Sgt. Butterick where Mr. Craig got the shell casing. The State responded that the testimony was not hearsay because it was not offered for the truth of the matter asserted but rather "to show what his response to that information was, i.e., he tagged it and subsequently sent it to the TBI." The Defendant then asserted that the State had failed to establish a sufficient chain of custody for the shell casing. The State offered to called Mr. Craig to the stand to testify about his finding of the shell casing.

The trial court noted that Mr. Craig had been sitting in the courtroom throughout the trial and could be disqualified from testifying but gave the State the option of calling him to the stand:

> Either I'm going to allow them to call the father to testify about where —what he did and what he gave to this officer or—I really don't think it's hearsay. . . I mean, there is some relevance to the fact of where it was found. There is some importance to that information, as well as what he did with it. So we can do it either way, but I'm going to allow the information to come forward.

The State then called Mr. Craig as a witness, who testified that he found the shell casing in the passenger's side door pocket of the red Ford pick-up truck after it had been returned to him early in 2007 by the Shelby County Sheriff's Department. He stated that he put the shell casing in a plastic bag and delivered it to Sg. Butterick the next day.

These facts and circumstances reasonably establish the identity and integrity of the shell casing. The Defendant makes no suggestion, nor is there any evidence in the record, of any evidence tampering by the State. We therefore conclude that under Rule 901, a sufficient chain of custody of the shell casing was established by the State.

However, the Defendant also contends that the trial court erred by allowing Mr. Craig to testify because he was in the courtroom during Sgt. Butterick's testimony, despite the fact that the rule of sequestration had been invoked. Tennessee Rule of Evidence 615 is the rule of sequestration, commonly referred to as "the Rule," and provides that, "[a]t the request of a party the court shall order witnesses, including rebuttal witnesses, excluded at trial or other adjudicatory hearing. . . .The court shall order all persons not to disclose by any means to excluded witnesses any live trial testimony or exhibits created in the courtroom by a witness." Tenn. R. Evid. 615. The purpose of the Rule is to "prevent one witness from hearing the testimony of another and adjusting his testimony accordingly." State v. Harris, 839 S.W.2d 54, 68 (Tenn. 1992). The Rule may be invoked at any time and is mandatory upon its invocation. See State v. Anthony, 836 S.W.2d 600, 605 (Tenn. Crim. App. 1992). The rule provides no prescribed sanction for a violation of the Rule; rather, a trial court retains discretion to impose the appropriate sanction. See State v. Black, 75 S.W.3d 422, 424 (Tenn. Crim. App. 2001). Further, "[t]he decision to exclude or allow the testimony is a matter within the discretion of the trial court, subject to a showing of abuse and prejudice to the complaining party." Id. at 424-25.

A review of our case law reveals that in the "most egregious cases," preventing the witness from testifying or declaring a mistrial may be appropriate. See id. However, the Advisory Commission states that, "[i]f a witness inadvertently and unintentionally hears some trial testimony, the sense of the rule would permit the judge to allow the witness to testify if fair under the circumstances." Tenn. R. Evid. 615, Advisory Commission Comments. This Court has previously concluded that, when determining the appropriate sanction, courts should generally look to the following three factors: (1) the harm caused by the sequestration violation; (2) the importance of the testimony of the witness who ignored the sequestration decree; and (3) who was at fault in the violation. State v. Coulter, 67 S.W.3d 3, 52 (Tenn. Crim. App. 2001) (citing Neil P. Cohen et al., Tennessee Law of Evidence § 615.4 (3d ed. 1995)).

We begin our analysis of this issue by first noting that our standard of review is one of abuse of discretion. See State v. Wicks, 729 S.W.2d 283, 286 (Tenn. Crim .App .1987). In reviewing a trial court's exercise of discretion, this Court will look to "'the seriousness of the violation and the prejudice, if any, that enured to the [aggrieved party].'" Coulter, 67 S.W.3d at 52 (quoting State v. James Edward French, No. 03C01-9503-CR-00096, 1996 WL 138289, at *6 (Tenn. Crim. App., Knoxville, Mar. 28, 1996)). The burden falls on the complaining party to demonstrate "abuse and prejudice." Black, 75 S.W.3d at 424.

In the instant case, the party at fault in the violation was the State; however, the Defendant has failed to demonstrate any harm caused by the sequestration violation, and the witness' testimony was largely inconsequential to the case against the Defendant. The shell casing found by Mr. Craig was a 9 mm casing. The Defendant testified that he owned a .40 caliber Glock handgun, and indeed, a .40 caliber bullet was found inside the victim's body during the autopsy. The proof at trial was that Mardacy Greer shot the victim with a 9 mm weapon. Moreover, the Defendant does not suggest that Mr. Craig altered his testimony based on what he heard prior to taking the stand, and he has failed to show how he was unduly prejudiced by the witness' testimony. Accordingly, we conclude the trial court did not abuse its discretion in allowing Mr Craig to testify. This issue is without merit.

### III. Extraneous Jury Influence

Next, the Defendant contends that the trial court should have granted him a new trial because the jury was influenced by extraneous information when the jurors discussed the case prior to deliberation. We agree with the State, however, that the jurors' actions do not amount to extraneous influence, and the trial court properly excluded testimony from one of the jurors on this issue at the hearing on the motion for a new trial.

In his motion for a new trial, the Defendant alleged that "jurors improperly and prematurely discussed the testimony and trial proceedings in violation of the court's admonishments." At the hearing on the motion for a new trial, the Defendant argued that these discussions amounted to outside influence. The trial court determined that such discussions by the juror did not "fit into the category" of outside influence as contemplated by Tennessee Rule of Evidence 606(b) and held that the testimony of one of the jurors was, therefore, not admissible. The trial court, however, allowed the Defendant to make an offer of proof.

The Defendant then called Beverly Spruill, who served as a juror during the Defendant's trial, to testify. She stated that about eight jurors discussed the case during the trial, before deliberations began, including the two alternate jurors who were eventually dismissed before deliberations.

Following our review of the record, we agree with the trial court that this testimony was not admissible. Tennessee Rule of Evidence 606(b) provides as follows:

> (b) Inquiry Into Validity of Verdict or Indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

In Walsh v. State, 166 S.W.3d 641, 649 (Tenn. 2005), the Tennessee Supreme Court held that Rule 606(b) of the Tennessee Rules of Evidence permits juror testimony to establish the fact of extraneous information or improper influence on the juror; however a juror is not permitted to testify about anything occurring during deliberations, including the juror's own internal thoughts, motivations or emotions. The court has previously explained that "extraneous information" is information from a source coming to the jury from the outside. State v. Coker, 746 S.W.2d 167, 171 (Tenn. 1987). Premature jury deliberations contrary to the trial court's instructions, however, have been found to be internal matters that do not involve extraneous information or outside influence. See State v. Frazier, 683 S.W.2d 346, 353 (Tenn. Crim. App. 1984). The proffered testimony of one of the jurors about premature jury deliberation in this case is exactly the type of evidence not admissible under the Rule or Walsh. Therefore, the Defendant is not entitled to relief on this issue.

## IV. Cumulative Effect of Errors

Finally, the Defendant alleges that the cumulative effect of the errors in the trial court effectively denied him a fair trial. Having found no prejudicial errors, we conclude that the Defendant is also not entitled to relief on this issue.

## Conclusion

For the reasons articulated above, we affirm the Defendant's convictions for second-degree murder and aggravated assault.

_____
DAVID H. WELLES, SPECIAL JUDGE